Fred E. Hummel, Receiver of Motor Transit Mutual Insurance Company, Appellant, v. Paul J. Alwart et al., Appellees.

Gen. No. 36,510.

Opinion filed May 8, 1933. Rehearing denied May 20, 1933.

WETTEN, PEGLER & DALE, for appellant.

BIPPUS, ROSE & BURT, for certain appellees.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

Fred E. Hummel, as receiver of the Motor Transit Mutual Insurance Company, filed his bill in the circuit court of Cook county seeking to have an $18,000 note,

secured by a mortgage on Wisconsin real estate, restored as part of the assets of the insurance company of which he was appointed receiver by the United States district court of the Northern District of Illinois, Eastern Division. The case was referred to a master who took the evidence, made up his report, and recommended a decree in accordance with the prayer of the bill. Exceptions to the report were sustained by the chancellor, the bill dismissed for want of equity, and complainant prosecutes this appeal.

The record discloses that the Motor Transit Mutual Insurance Company was incorporated under the laws of this State to conduct a mutual insurance business; that shortly thereafter another corporation known as the Transit Underwriting Corporation was organized under the laws of this State, whose sole purpose apparently was to conduct and operate the business of the insurance company, and a contract to that effect was entered into between the two corporations. Both corporations occupied the same office in Chicago, and the managing company proceeded to procure motor bus companies and others to take out policies of insurance in the insurance company. So that the insurance company could obtain a license to permit it to engage in the business for which it was incorporated, it was necessary that it procure some assets, as required by the statute, and for this purpose the defendants Paul J. Alwart and Katherine S. Alwart, his wife, on August 1, 1925, made their promissory note for $18,000 payable to the order of Edward T. Smith, due five years after date, with interest at six per cent payable semiannually. The payment of the note was secured by a mortgage given by the makers of the note on real estate in Barron county, Wisconsin. This note and mortgage were given by Alwart to the managing corporation to be turned over to the insurance company, and the note and trust deed were placed

in a safety deposit box in Chicago, which could be opened only in the presence of Alwart or his lawyer, and Rice or Claypool (both being connected with the managing company) and an executive officer of the insurance company. This note and mortgage remained in the safety deposit box for about four years. About the time the managing company turned over to the insurance company the $18,000 note and mortgage and other securities that went to make up the surplus as a prerequisite to the obtaining by the insurance company of a license to issue insurance policies, the insurance company gave its "surplus note" for $75,000 to the managing company. The note drew interest at eight per cent per annum, payable semi-annually, and contained the following: "which principal and interest shall be repaid only out of the surplus earnings of the corporation at such times and in such amounts as shall be determined by the Board of Directors of the corporation, and shall not otherwise be a liability or claim against the corporation or any of its assets."

The insurance company had issued a number of policies but apparently made no money after the year 1926, and beginning about 1929 or earlier was in a bad financial way. The defendant Edward T. Smith was a brother-in-law of Alwart's and employed by him. The defendant Wagner was an employee of defendant Alwart, who was engaged in the coal business. May 6, 1929, defendant Alwart caused Smith and his wife to execute their promissory note for $18,000, payable five years after date to the order of Wagner, with interest at six per cent per annum. On the same date Alwart and his wife deeded the Wisconsin property to Smith and at the same time Smith released the mortgage Alwart had given him on the same property. Smith and his wife on the same date gave a mortgage to Wagner to secure the payment of the last mentioned

note. Shortly thereafter Alwart, together with two or more persons who had the right to open the safety deposit box in which the Alwart note and mortgage were kept, opened the box, and the Alwart note and mortgage were delivered to him, and the $18,000 note made by Smith and the mortgage were placed in the box in lieu thereof. There were other transfers, back and forth, of the Wisconsin property but we think it of no importance to detail the evidence on this point because it is clear and undisputed that the property at all times belonged to the defendant Alwart, and that the various transfers, releasing of mortgage, etc., were merely colorable. Neither Wagner nor Smith ever had any interest in the property. Smith never received anything for the note. Alwart himself frankly testified, in referring to the Wisconsin property, ''I own all the furniture and everything there. There is no debts on it. So far as the record title is concerned, there is no encumbrance on it, never was, it was always mine. As a matter of fact, those mortgages from Smith to Wagner and these various conveyances, were all without consideration, I did not receive any money. . . . I procured all these various papers to be executed for my convenience. . . . Neither Smith nor Wagner nor Crane had anything to do with drawing up those papers. . . . Crane paid nothing to me for the deed to him, and I paid nothing back to Crane for the deed back to myself.''

It further appears from the evidence that when Alwart delivered the $18,000 note and mortgage made by himself and wife to the managing company to be turned over by it to the insurance company, he was given stock in the managing corporation and a receipt for the note and mortgage. The receipt recited that the managing company had also received from Alwart a bond of a safe deposit company for $1,000, and provided that the note, mortgage and bond were to be put

in the safety deposit box in Chicago, which was to be accessible only to certain designated persons, above mentioned, and that the note, mortgage and bond were to be loaned to the insurance company ''for the purpose of creating admitted assets in accordance with sub-section 8 of Section 9 governing the organization of Mutual Insurance Company in Illinois''; and further, that the insurance company should pay six per cent on the face value of the securities to the underwriting company, and the underwriting company agreed, upon receipt of the interest from the insurance company, to turn the same over to Alwart and that ''As a part of the consideration of the loan of said Securities'' the managing company was to deliver a certain number of certificates of its stock to Alwart. The receipt further provided that Alwart might withdraw the securities at any time thereafter upon condition that he notify the managing company in writing that he desired his securities returned, provided, however, that he might not demand more than 25 per cent of them within 90 days, ''it being the intention hereof that all of said securities shall on demand, as aforesaid, be returned within one year from the time of the demand,'' etc. It further provided that if the securities were returned then Alwart should return a proportionate share of the stock which had been given him in the managing company for the securities; and that, ''By mutual arrangement between the parties other securities may be substituted by the Loaner (Alwart) for those above mentioned.''

November 16, 1929, complainant was appointed receiver of the insurance company by the United States district court in an equity proceeding. He was authorized and directed, among other things, to collect the assets of the insurance company. July 2, 1930, a decree was entered by the United States district court in which it was found that the insurance com-

pany was "solvent up to the end of the year 1926, but that it thereafter continued to suffer losses and was not thereafter possessed of assets equal to the unearned premium reserve and other liabilities," and that there were outstanding and unpaid claims aggregating $389,317.79 as of November 16, 1929; that the total liabilities on that date amounted to $478,195.26, while the assets did not exceed $68,777.94 some of which was represented by mortgage loans on real estate and on that date there was a deficit of $409,417.32. It was further found that the policy holders were liable to assessment and it was decreed that the maximum liability, by way of assessment, of each policy holder should not exceed an amount equal to 12 times the average monthly premium which the policy holder was obligated to pay.

The evidence further shows that during the time the insurance company was conducting business—a period of more than four years—it made annual verified reports to the insurance department of this State, as required by statute, and these reports show the note for $18,000 and the mortgage securing it executed by the defendant Alwart as a part of the assets of the insurance company. There is also evidence to the effect that the insurance department of the State caused an examination to be made of the insurance company and that the mortgage and note appeared as a part of the insurance company's assets.

John Bing, an auditor who had been employed by the managing company that was operating the insurance company, and who was afterward retained by the complainant receiver, testified that he made an audit of the insurance company's books and that the total assets of the company were $82,715.04, the total liabilities $478,195.26, leaving a deficit of $395,480.22 as of November 16, 1929, and that these books showed as a part of the assets of the insurance company Alwart's

note and mortgage. There was further evidence to the effect that Alwart was an officer and director of the managing company whose sole business, as stated, was to manage the business of the insurance company. This was shown partly by the records of the managing company. Alwart denied that he ever acted as treasurer or director of the managing company.

There is further evidence that 252 claims were filed with the receiver in the federal court, aggregating $909,613.65, that the assets received by the receiver were $68,777.94, and that 66 of the claims were filed by the policy holders and 186 by other creditors.

Section 9, chapter 73 (Cahill's Statutes) provides that an insurance company such as the insurance company involved in this case, must be licensed before it can transact any business; and section 19 of the Act, provides that any director, officer or member or any other person of a mutual insurance company may advance to the company money necessary for the purpose of its business so as to enable it to comply with the requirements of the law; and that such moneys "shall not be a liability or claim against the corporation or any of its assets, except as herein provided, and shall be repaid only out of the surplus earnings of such corporation." It is conceded that the statute required the insurance company in question to have certain "admitted assets" before it could be licensed to transact business. To make up a part of these assets defendant Alwart delivered his $18,000 note and mortgage in question, and it will be conclusively presumed he knew the provisions of the law; and having given the note and mortgage to enable the company to obtain from the state a license to do business, after obtaining which the company proceeded to conduct its business, he will not now be permitted to say that he had a right to withdraw the note and mortgage, because section 19, above quoted from, expressly provides that any contribution made to the

assets of an insurance company is not to be paid except
out of the surplus earnings of the company. In the
instant case, there being no surplus, the withdrawal
of the note and mortgage was unwarranted and there-
fore the provision in the receipt given to Alwart by
the managing company, which provided that he might
withdraw the securities under certain conditions, was
contrary to law and void.

Nor is there any merit in his contention that there
was no consideration moving to him for the note and
mortgage. The receipt given to him by the managing
company, to whom he directly delivered the note and
mortgage, expressly provided that he was to be paid
six per cent interest on the face value of the securities,
and that he was to be given stock in the managing com-
pany as a part of the consideration for the note. And
the evidence shows such stock was afterward given
to him. The fact that he later turned back the stock
does not tend to show that he received no considera-
tion for the note and mortgage. The removal of the
note and mortgage from the safety deposit box and the
delivery of them to Alwart, as above stated, was
wholly unwarranted for the further reason that no
such authority was even attempted to be given by
anyone representing the insurance company.

The defendant also contends that there was no com-
petent evidence that the insurance company was or is
insolvent, and in support of this it is said that when
the books of the insurance company were produced
before the master no one testified to their correctness,
and that without the books the evidence is entirely in-
sufficient to show that the insurance company was in-
solvent at any time. It is true that no one testified
that the books were true and accurate and therefore
they were not admissible in evidence; but the fact re-
mains that representatives of the insurance company
for a period of three years made verified annual re-
ports to the state insurance department, as the statute

required, and took their information from those very books. The decree entered by the United States district court expressly finds the insolvency of the insurance company, and the fact that defendant Alwart was not a party to that proceeding in no way affects the question. The court in that case had jurisdiction of the proper parties and the subject matter, and it was its duty to find whether the company was solvent or insolvent. Defendant was not a necessary party, and the decree of that court finding that the company was insolvent is an adjudication of that question.

The contention of defendant Alwart that the complainant receiver has no greater rights than the insurance company, and that since the insurance company could not recover on the note and mortgage the receiver is unable to do so, is also without merit. As stated, Alwart caused the note and trust deed to be made and delivered to the insurance company for the purpose of creating the appearance of assets to enable the insurance company to obtain a license to transact its business. Under the evidence as above set forth, Alwart is estopped to question the right of the receiver to recover on the note and mortgage in this case. (See *Golden v. Cervenka,* 278 Ill. 409.)

Counsel for the defendants say that a by-law of the insurance company provides that "The maximum contingent liability of members shall be twice the premium charged of any calendar year," and that the form of policy issued by the insurance company contains a similar provision. Counsel then say that the Mutual Insurance Company has no capital stock and consequently no stockholders; that its members are policy holders associated together for the purpose of insuring themselves against a certain class of losses covered by the policies; that the policy holders have the right at the annual meeting to elect directors, and by the terms of the by-laws and policies they bound them-

selves to meet the combined losses by assessment of not more than double the annual premium obligations. It is argued therefore that "The policy holders are the insurance company in this case, and it adequately appears from the record that they are attempting to collect from Alwart a large sum of money to divide among themselves"; and that if the policy holders paid their own moral and legal obligations under the policies, the company would not be insolvent. We have heretofore pointed out that there are many creditors of the insurance company who are not policy holders. Moreover, it is nowhere pointed out by counsel for Alwart that the obligation of policy holders can be paid only out of moneys derived from assessments against the policy holders. Nor is there any statement or argument made as to why the statute requires that a reserve fund be provided before a mutual insurance company is licensed to transact business. We think the purpose of the statute in requiring this fund to be obtained before a mutual company is authorized to issue policies is for the protection of the policy holders, as well as any other creditor of the insurance company. In fact we are of the opinion that these assets are obtained primarily, if not solely, for the benefit of the future policy holders.

We hold that Alwart is personally liable on the note according to its terms, that the mortgage is valid and binding, and that complainant is entitled to the relief prayed for in his bill of complaint as amended.

The decree of the circuit court of Cook county is reversed and the cause remanded with directions to enter a decree in favor of the complainant as prayed for in his bill of complaint as amended.

*Reversed and remanded with directions.*

McSurely, P. J., and Matchett, J., concur.